FILED IN CHAMBERS
9-26-03
Luther D. Thomas, Clerk

By: J C Campbell
Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

APA EXCELSIOR III L.P., *et al.*,           :

        Plaintiffs,           :

                    :

        v.           :    CIVIL ACTION NO.
                    :    1:99-CV-1377-JOF

PREMIERE TECHNOLOGIES, INC.,           :
*et al.*,

                    :

        Defendants.           :

## ORDER

This matter is before the court on Defendants' motion for summary judgment [150-1].

## I.    Background

### A.    Procedural History and Facts

Plaintiffs,[1] former shareholders of Xpedite Systems, Inc. ("Xpedite"), filed the instant

lawsuit against Defendants, Premiere Technologies, Inc. ("Premiere"); Boland Jones, ("B.

Jones"), Premiere's President and Chairman of the Board; Patrick Jones ("P. Jones"),

Premiere's Vice-President for Finance and Legal; George W. Baker, Sr. ("Baker"), one of

---

[1] The Plaintiff Funds are APA Excelsior III L.P., APA Excelsior III Offshore L.P., APA/Fostin Pennsylvania Venture Capital Fund, and CIN Venture Nominees Limited. Stuart A. Epstein and David Epstein are individual Plaintiffs.

Premiere's Directors; Eduard J. Mayer ("Mayer"), another Director; and Raymond H. Pirtle ("Pirtle"), also a Director, on November 4, 1998 in the United States District Court for the Southern District of New York. Plaintiffs alleged the following causes of action: (1) breach of contract against Premiere, (2) negligent misrepresentation against all Defendants, (3) violations of Section 11 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77k, against all Defendants, (4) violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2) against all Defendants, and (5) violations of Section 15 of the Securities Act, 15 U.S.C. § 77o against the individual Defendants. On May 19, 1999, the Honorable Allen G. Schwartz transferred Plaintiffs' suit to this court because of the factual and legal similarities between this case and twenty-two consolidated class action lawsuits previously filed against Premiere and styled *In re Premiere Tech., Inc. Sec. Litig.*, Civil Action No. 1:98-CV-1804-JOF (N.D. Ga.).

Plaintiff Funds ("the APA Funds") are managed under Alan Patricof's company, APA. Robert Chefitz, an employee of APA and a limited partner of the general partner of each of the Plaintiff Funds, monitored the APA Funds' investments in Xpedite. Plaintiffs Stuart Epstein and David Epstein are brothers who invested in Xpedite as individual investors. Mr. Chefitz and David Epstein held seats on the Board of Directors of Xpedite. At the time of the merger between Xpedite and Premiere, the APA Funds owned 19.7% of the

AO 72A
(Rev.8/82)

outstanding shares of Xpedite; Plaintiff David Epstein owned 6.1%; and Plaintiff Stuart Epstein less than 3%.

Xpedite provides enhanced facsimile transmission services. In early 1997, Xpedite began considering the possibility of merger with another company. In February 1997, members of Xpedite's senior management and certain financial institutions ("the MBO Group") offered to buy Xpedite for $22.50 per share. At the same time, Xpedite's Board of Directors formed a Special Committee to consider the alternatives. Mr. Chefitz was appointed to head the Special Committee, and David Epstein was appointed to be a member of the Special Committee. The Special Committee hired Merrill Lynch, Pierce, Fenner & Smith ("Merrill Lynch") to assist it in the process. Xpedite also hired Ernst & Young LLP ("Ernst & Young") and Paul Hastings, Janofsky & Walker LLP ("Paul Hastings") to advise it. After receiving the offer from the MBO Group, the Special Committee instructed Merrill Lynch to solicit additional offers for Xpedite. In August, the MBO Group raised its bid twice, and the Special Committee accepted the MBO Group's offer of $23.25 per share. In connection with this offer, Xpedite agreed to purchase the outstanding shares of certain European affiliates of Xpedite. The European transaction apparently proceeded, despite the fact that Xpedite eventually declined the MBO Group's acquisition offer.

In late October 1997, Premiere Technologies, Inc. (n/k/a PTEK Holdings, Inc.) ("Premiere"), expressed an interest in acquiring Xpedite. The parties eventually agreed upon

3

a stock-for-stock transaction that placed a $34.00 per share price on Xpedite's stock.  As a condition to the execution of a Merger Agreement between Xpedite and Premiere, Premiere required that Plaintiffs, as well as certain other Xpedite shareholders, execute Stockholder Agreements.  On November 14, 1997, Premiere announced that it had signed a definitive agreement by which it acquired Xpedite for $34.00 per share in a stock-for-stock merger.

On January 28, 1998, Premiere filed with the Securities & Exchange Commission a Registration Statement for the issuance of Premiere common stock to Xpedite shareholders in connection with the merger of Xpedite and Premiere.  The next day Premiere disseminated a Prospectus to Xpedite shareholders as part of the Registration Statement.  The Prospectus contained various statements about Xpedite's acquisitions and integration of those acquisitions.  The Prospectus also contained information about a product called Orchestrate, intended to be a comprehensive suite of integrated communications services that Premiere publicly launched on June 24, 1997.  Xpedite's shareholders approved the acquisition by Premiere in a vote on February 27, 1998.

On June 10, 1998, Premiere issued a press release announcing an expected after-tax loss of between $0.07 and $0.11 per share for the quarter due to the financial difficulties of two customers, as well as costs and one-time charges related to Orchestrate.com, a new subsidiary, and increased costs related to the company's acquisition growth.  That day, Premiere common stock dropped from $14.4375 per share to $10.375 per share, a decline of

4

28% and a 69% drop from the $34.00 Plaintiffs received in the Merger. At the time Plaintiffs

filed their complaint, Premiere common stock was trading at approximately $5.00 per share.

In their complaint, Plaintiffs contend that in connection with the Stockholder

Agreement, Premiere and its representatives caused materially false and misleading financial

information and operational data to be conveyed to Xpedite, Plaintiffs, and their respective

advisors and representatives, concerning generally Premiere's valuation, various prior

acquisitions of Premiere and Premiere's integration of those acquisitions, and the projected

growth and profitability of Premiere. Plaintiffs also allege that the statements contained in

the Registration Statement and Prospectus were materially false and misleading when issued

because they misrepresented or omitted Premiere's difficulty in integrating the Voice-Tel and

VoiceCom acquisitions, as well as overstating the capabilities of the Orchestrate product and

the future viability of Premiere's business.

In an order dated February 28, 2000, the court dismissed Plaintiffs' claims based on

corporate mismanagement under the "*Sante Fe* doctrine" which counsels that claims grounded

in corporate mismanagement are not cognizable under federal securities laws. *See Sante Fe

Industries, Inc. v. Green*, 430 U.S. 462, 477 (1977).[2] The court rejected Defendants' defenses

---

[2] These claims include allegations that (1) Premiere lacked an effective plan for integrating and consolidating Voice-Tel; (2) Premiere significantly reduced staffing at Voice-Tel in an effort to reduce costs, thereby limiting customer service; (3) Premiere attempted to consolidate the billing for various Voice-Tel franchises by reducing the number of billing offices, resulting in a decline in customer service; (4) Premiere's attempt to cut costs at

5

based on hindsight, the "bespeaks caution" doctrine, the statutory safe harbor provisions under the PSLRA, and control person liability under section 15, and allowed Plaintiffs' other securities claims to proceed. With respect to Plaintiffs' state law claims, the court dismissed Plaintiffs' breach of contract claims because Plaintiffs were not parties or third-party beneficiaries to the Merger Agreement, nor could Plaintiffs claim standing by reading the Stockholder Agreement in conjunction with the Merger Agreement. The court, however, allowed Plaintiffs' negligent misrepresentation claim to proceed.[3] During the course of discovery, on August 23, 2001, Plaintiffs dismissed without prejudice Individual Defendant Eduard J. Mayer. On January 23, 2002, the court granted Plaintiffs' motion to compel mediation. Mediation was unsuccessful and discovery continued. On October 17, 2002, Defendants filed the instant motion for summary judgment.

---

Voice-Tel caused a decline in revenues, margins, and earnings; (5) Premiere's efforts to reduce and eliminate costs at Voice-Tel were ineffective, and Premiere lacked the management information systems to ascertain the full extent of its expenses; (6) Premiere lacked an effective plan for integrating and consolidating VoiceCom; (7) Premiere's plans to cross-sell its products to VoiceCom's Fortune 500 customers was unrealistic; (8) Premiere lacked sufficient internal controls to manage its growth and integrate its acquisitions; (9) Premiere lacked the management capability to implement its strategy for growing and integrating its acquisitions; and (10) Premiere lacked sufficient internal processes for assessing properly the credit risk of its customers.

[3]On February 7, 2001, the court granted Defendants' motion to consolidate this litigation with *In re Premiere Tech., Inc. Sec. Litig.*, Civil Action No. 98-CV-1804-JOF, for the purposes of discovery. On April 18, 2002, the class action parties reached a settlement and the court approved the final settlement agreement on July 8, 2002.

**B.     Contentions**

Defendants contend that Plaintiffs do not have standing to raise claims under Sections 11 and 12 of the Securities Act of 1933 because they did not acquire Premiere stock pursuant to a public offering but rather had independent professional advisors and access to inside information about Premiere.     Defendants also contend that Plaintiffs' negligent misrepresentation claim fails because Plaintiffs cannot establish justifiable reliance due to the merger clause in the Stockholder Agreements and the failure of Plaintiffs to engage in effective due diligence.

Plaintiffs respond that Defendants do not contest the materially false and misleading misrepresentations and omissions of facts made by Defendants, but rather reargue the standing issues raised by Defendants in their motion to dismiss and rejected by the court. Plaintiffs argue that any party who receives stock pursuant to a filed registration statement and prospectus has standing to raise claims under Sections 11 and 12.  Plaintiffs further contend that New York or Delaware law applies to their negligent misrepresentation claim – not Georgia law – and under the proper law, a merger clause in a contract does not bar an action for negligent misrepresentation.   Moreover, Plaintiffs aver that they never had any due diligence rights and that any failure of theirs to conduct due diligence does not bar their negligent misrepresentation claim.

7

## II.    Discussion

### A.    Negligent Misrepresentation

Plaintiffs contend that in connection with the Stockholder Agreements, Defendants caused certain financial information and operational data to be conveyed to Plaintiffs that was materially false and misleading. Plaintiffs assert this information induced them to execute the Stockholder Agreements and consent to the terms of the Merger Agreement. Specifically, Plaintiffs argue that Premiere did not advise Xpedite of (1) existing operational problems in integrating Voice-Tel and VoiceCom, (2) the status of Orchestrate, (3) Premiere's problems with calling card customers, and (4) DigiTEC 2000, Inc.'s likely failure to meet Premiere's revenue expectations. Plaintiffs do not contend there were any misrepresentations or omissions in the Stockholder Agreements themselves. Before addressing Plaintiffs' allegations, the court must first determine which state's law applies to Plaintiffs' negligent misrepresentation claim.

#### 1.    Choice of Law

Plaintiffs contend that New York law applies to their claims and Defendants contend Georgia law applies.[4] Plaintiffs pled only federal question jurisdiction in their complaint. *See*

---

[4]Both parties appear to recognize the possibility that Delaware law would apply to Plaintiffs' claims because the Stockholder Agreements contain Delaware choice of law clauses. But, as the court explained in its previous order, the elements of a negligent misrepresentation claim are similar under both New York and Delaware law. *See* Order, at 30 n.9.

Cmplt., ¶ 3. As such, the court exercises supplemental jurisdiction over Plaintiffs' state law claims based on diversity jurisdiction. In diversity cases, a federal court generally looks to the choice of law rules of the state in which it sits. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487 (1941). Supplemental state law claims in a case where jurisdiction is based on a federal question are also decided with reference to the choice of law provisions of the state in which the district court sits. *See BancOklahoma Mortgage Corp. v. Capital Title Co.*, 194 F.3d 1089, 1103 (10th Cir. 1999). However, when a defendant seeks and obtains a transfer of venue pursuant to 28 U.S.C. § 1404(a) for convenience – and not jurisdictional – purposes, the district court must apply the choice of law rules for the forum in which the plaintiff originally brought the action. *See Van Dusen v. Barrack*, 376 U.S. 612 (1964); *Boardman Petroleum, Inc. v. Federated Mutual Insurance Co.*, 135 F.3d 750, 752 (11th Cir. 1998). Here, the Honorable Allen G. Schwartz granted Defendants' motion to transfer venue under 28 U.S.C. § 1404(a) based on convenience and the interest of justice due to the class action litigation against Defendants that had already been initiated in this court when Plaintiffs filed suit in New York. As such, venue was not transferred for jurisdictional issues. Accordingly, the court must apply the choice of law principles of New York to Plaintiffs' negligent misrepresentation claim.

Under New York choice of law rules governing torts, the court must conduct an "interest analysis" which instructs that a court should apply the law of the jurisdiction having

9

the greatest interest in the litigation. *See The Mark Andrew of the Palm Beaches v. GMAC Commercial Mortgage*, 265 F. Supp. 2d 366, 377 (S.D.N.Y. 2003) (citing *Lazard Freres & Co. v. Protective Life Insurance Co.*, 108 F.3d 1531, 1539 n.5 (2d Cir. 1997)). In torts considered "conduct regulating," New York law applies the law of the place of the tort. *Id.* Negligent misrepresentation is a "conduct regulating" tort. *Id.* at 378 (citing *Geneva Pharmaceutical Technology Corp. v. Barr Laboratories*, 201 F. Supp. 2d 236, 287 n.32 (S.D.N.Y. 2002)). The place of the tort is "the place where the alleged injury is inflicted, rather than where the actions causing the injury originated." *Id.* Here, the court finds that of the Plaintiffs, the APA Funds, located in New York, collectively held the most number of shares in Xpedite, and thus, comparatively, New York has the greatest interest in the litigation. Accordingly, the court applies New York law to Plaintiffs' negligent misrepresentation claim.

Under New York law, the elements of a negligent misrepresentation claim are "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000). Defendants moved for summary judgment on the

10

reasonable reliance element only contending that Plaintiffs cannot establish justifiable reliance because of the merger clause in the Stockholder Agreements and because Plaintiffs failed to engage in sufficient due diligence.

     2.   Merger Clause

Defendants first contend that Plaintiffs' negligent misrepresentation claim fails because Plaintiffs cannot demonstrate reasonable reliance in light of the integration clause contained in the Stockholder Agreement. The Stockholder Agreement provides that "[t]his Agreement constitutes the entire agreement among the parties with respect to the subject matter hereof and supercedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject hereof." Stockholder Agreement, Section 6.02. Numerous courts applying New York law have held that a merger clause, standing alone, cannot preclude reasonable reliance as a matter of law.[5] *See, e.g., Harsco Corp. v. Segui*, 91 F.3d 337, 343-48 (2d Cir. 1996); *Consolidated Edison, Inc. v. Northeast Utilities*, 249 F. Supp. 2d 387, 401-03 (S.D.N.Y. 2003); *Emergent Capital Investment Management LLC*

---

[5]The element of reasonable reliance necessary *inter alia* to prove claims of fraud, fraudulent inducement and negligent misrepresentation is analyzed similarly in each of these causes of action. *See Emergent Capital Investment Management LLC v. Stonepath Group, Inc.*, 2003 WL 22053957, ___ F.3d ___ (2d Cir., Sept. 4, 2003) (utilizing same reasonable reliance standard for '34 Act and common law fraud claims); *Consolidated Edison, Inc. v. Northeast Utilities*, 249 F. Supp. 2d 387, 408-09 (S.D.N.Y. 2003) (rejecting the plaintiff's fraudulent inducement and negligent misrepresentation claims under the same reasonable reliance analysis barring the plaintiff's fraud claim).

AO 72A
(Rev.8/82)

*v. Stonepath Group, Inc.*, 195 F. Supp. 2d 551, 562 (S.D.N.Y. 2002), *rev'd in part on other grounds, Emergent Capital Investment Management LLC v. Stonepath Group, Inc.*, 2003 WL 22053957, ___ F.3d ___ (2d Cir., Sept. 4, 2003). If a merger clause is accompanied by some other disclaimer specifically referencing the investigation undertaken or the fact that certain representations or warranties were not made, then a plaintiff's claim may be barred. *See Dannan Realty Corp. v. Harris*, 5 N.Y.2d 317, 319-20 (1959) (where party specifically disclaims reliance on representation in contract, party cannot assert it was fraudulently induced to entered into contract based on the representation it disclaimed). Here, however, there were no specific warranties or representations in the Stockholder Agreement, and cases cited by Defendants are distinguishable for this reason. *See, e.g., Simms v. Biondo*, 816 F. Supp. 814, 823 (E.D.N.Y. 1993) (merger clause references investigation). Thus, the merger clause alone does not bar Plaintiffs' negligent misrepresentation claim.

> 3.    Other Circumstances

Under New York law, however, the analysis does not end with consideration of an integration clause or specific disclaimer of representations. Instead, the reasonableness of a plaintiff's reliance is assessed by considering "the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *See Emergent Capital Investment Management LLC v. Stonepath Group, Inc.*, 2003 WL 22053957, at *4, ___ F.3d ___ (2d Cir., Sept. 4, 2003).

12

These factors have been applied in a variety of contexts. In *Lazard Freres & Co. v. Protective Life Insurance*, 108 F.3d 1531 (2d Cir. 1997), the plaintiff, an investment bank and registered broker-dealer, sued the defendant insurance company under a breach of contract theory over defendant's purported agreement to purchase a $10 million bank debt. The plaintiff's agent encouraged the defendant's representative to agree immediately to purchase the debt because a report would soon be publicly issued that showed 20% of the face value of the debt would be paid shortly and there were no other circumstances that would reduce the value of the debt. *Id.* at 1534. After the closing documents had been prepared, the defendant finally read the report and concluded that the plaintiff had misrepresented its contents. The defendant refused to close the deal, forcing the plaintiff to find another buyer at a much lower price, and the plaintiff filed suit. In considering its affirmative defenses, the court determined that the defendant could not justifiably rely on the plaintiff's oral representations because the defendant was a sophisticated business party and thus, operated "under a further duty to protect itself from misrepresentation" through investigation. *Id.* at 1543.

In *Grumman Allied Industries, Inc. v. Rohr Industries, Inc.*, 748 F.2d 729 (2d Cir. 1984), Grumman alleged that Rohr failed to disclose material facts relating to the testing of a bus known as Model 870 during acquisition negotiations between Grumman and a subsidiary of Rohr. The court first concluded that specific disclaimers in the acquisition agreement were fatal to Grumman's negligent misrepresentation claims. The court also

13

rejected Grumman's argument that it reasonably relied on Rohr's representations concerning the Model 870 bus "in light of undisputed evidence demonstrating that Grumman enjoyed unfettered access to [defendant's] plants, personnel and documents; and that it possessed the legal, technical and business expertise necessary to make effective use of that access." *Id.* at 737. "Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance." *Id.* (citing *Marine Midland Bank v. Palm Beach Moorings, Inc.*, 61 A.D.2d 927, 928, 403 N.Y.S.2d 15, 17 (1st Dept.1978) (finding no reasonable reliance where plaintiff had access to corporate records necessary to confirm or disprove the substance of the verbal assurances)). The court also noted that Grumman had been "represented by a sophisticated group of counsel, executives and engineers" and "despite its knowledge that the Model 870 was undergoing endurance testing in late 1977, Grumman neither inquired into the results of that testing, nor asked to scrutinize testing reports." *Id.* at 729.

In *Consolidated Edison Inc. v. Northeast Utilities*, 249 F. Supp. 2d 387 (S.D.N.Y. 2003), plaintiff, Con Edison, sued the defendant for fraud and negligent misrepresentation after a multibillion dollar merger failed, alleging that oral statements made during the due diligence process contained material misrepresentations. Con Edison argued that the defendant failed to disclose the nature of a supply contract that Select, the defendant's

14

unregulated energy marketing subsidiary, signed with another retail power company. In addition to noting various disclaimers and integration clauses in the merger agreement, the court found that Con Edison could not establish justifiable reliance because it was a sophisticated party represented by sophisticated legal and financial advisors and had the opportunity throughout the due diligence process to obtain information about Select. *Id.* at 405. The court also noted that Con Edison had not "demonstrated that it made sufficient efforts to obtain the type of information about Select and [the defendant's] risk management policies that it now claims were integral to the decision to merge" with the defendant. *Id.*

Here, in their 244-paragraph statement of material facts, Plaintiffs recite the statements they believe to be material misrepresentations and the facts that Plaintiffs contend Defendants knew at the time they made the alleged misrepresentations. For the purposes of this motion, however, the court – and Defendants themselves, for that matter – takes all of those allegations as true. Defendants move for summary judgment solely on the element of reasonable reliance. Thus, the representations themselves are not particularly relevant to the court's analysis of reasonable reliance. Plaintiffs nowhere proffer evidence to show that they engaged in sufficient due diligence or that they were denied access to materials during the due diligence process. Instead, Plaintiffs primarily argue that they did not have any due diligence rights, but Xpedite did. The court disagrees. Plaintiffs were the major shareholders in Xpedite. The individual managing the Plaintiff APA Funds, Robert Chefitz, sat on the Board

15

of Directors of Xpedite and chaired the Special Committee appointed to consider offers made to Xpedite for merger. Mr. Chefitz also supervised the due diligence process. Plaintiff David Epstein sat on the Special Committee and participated in at least one due diligence meeting. Plaintiffs do not contend that Xpedite, itself, barred them from any access to due diligence materials. To contend that only Xpedite, and not Plaintiffs, was able to conduct due diligence splits too fine a hair. Plaintiffs also contend that they, themselves, did not actually engage in the due diligence and hired outside consultants to do that work for them. This fact, however, does not relieve them of the requirement to satisfy the justifiable reliance element of their negligent misrepresentation claim. Furthermore, the manager of APA Funds directed the due diligence efforts and was aware of the information produced during that process. *See* Chefitz Depo., at 99-100 (testifying that he apprised himself of the information received in the due diligence process) and *id.* at 150 (testifying that he directed the "efforts of the various professionals who were assisting in due diligence").

Plaintiffs admit that Premiere provided the due diligence team with both public and confidential financial information. Xpedite's Due Diligence Team, including David Epstein and Robert Chefitz, also met in Atlanta with Premiere's senior officers, including Boland Jones, Jeff Allred, and Patrick Jones, on November 4, 1997. At that meeting, Premiere presented financial information on Premiere's calling card business, Voice-Tel and VoiceCom, and Orchestrate. Additional financial information was also transmitted to Merrill

16

Lynch. As of November 13, 1997, Xpedite's management attended Premiere's management meetings, had a "dialogue about the ongoing affairs of the business," and were "privy to information about the day-to-day operations of the business and the plans for the business." Chefitz Depo., at 218-19. Thus, by Plaintiffs' own admissions, they had access to due diligence information. Because the court finds that Plaintiffs had the benefits of the due diligence process, the court next addresses the due diligence efforts themselves in light of the fact that Premiere's public filings warned of difficulties in each of the areas in which Plaintiffs complain misrepresentations were made.

Premiere's Registration Statement warned of the risks involved in integrating new acquisitions. *See* September 26, 1997 Form S-3, at 9, 11 ("The Company believes that given the size and fragmented nature of the facilities and businesses of the Voice-Tel Entities and the technical complexity of integrating this Company's products with those of Voice-Tel, the integration process will be particularly complex and has and will place significant demands on the Company's management, engineering, financial, and other resources. The successful consolidation of the Voice-Tel Entities and their integration into the Company's operations is critical to the Company's future performance. . . . There can be no assurance that the Voice-Tel Entities will be successfully consolidated or integrated with the Company's operations on schedule or at all, that the Voice-Tel Acquisitions will result in net sales or earnings level [sic] that would justify the Company's investment therein or the expenses

17

related thereto or that operational synergies will develop as projected."). Mr. Chefitz also

testified that he understood the integration process would be a "substantial task." *See* Chefitz

Depo., at 166. Mr. Chefitz stated:

> Q:    And that [integration of Voice-Tel] would have been a risk attendant to
>       whether or not integration could be accomplished successfully, correct?
>
>       MR. WEISS:        Objection.
>
> A:    It would have been a risk which – at the time Premiere and Xpedite
>       entered into its agreement. There would be ample time to identify how
>       well that integration was going or not going.
>
> Q:    And that would have been a subject that could have been covered in due
>       diligence, correct?
>
> A:    Correct.
>
> Q:    And due diligence into the success of the integration of Voice-Tel could
>       have included discussions with the various former franchisees who were
>       now part of the Premiere organization, often as employees, correct?
>
> A:    Correct.
>
>       MR. WEISS:        Objection.

*Id.* at 166-67. Mr. Chefitz, however, did not have any discussions with former Voice-Tel

franchisees about the integration efforts, nor did he direct anyone to undertake such an

investigation. *Id.* at 168. He assumed Xpedite "management would have had those

conversations." *Id.*

18

Similarly, Premiere noted in its public filings that there might be difficulties with the development of Orchestrate. *See* September 26, 1997 Form S-3, at 11-12, 18, 23-24 (noting that Orchestrate's product line competed in markets where larger companies were working on establishing a unified messaging solution and that the failure of Orchestrate to come to the market successfully could have materially adverse impact on Premiere's business). Mr. Chefitz also testified that there were no representations or warranties made to him regarding whether Orchestrate would ever reach the market. *See* Chefitz Depo., at 175-76. However, there is no evidence in the record that any person from Plaintiffs' due diligence team even asked to see the Orchestrate technology.

In its Form S-3, Premiere also warned that the financial viability of its customers could impact Premiere's business by noting that the "majority of companies that have chosen to outsource communication card services to Premiere are small or medium-sized telecommunications companies that may be unable to withstand intense competition in the telecommunications industry . . ., there can be no assurance that the failure of one of more of Premiere's licensees to develop and sustain a market for Premiere's services, or termination of one or more of Premiere's licensing relationships, will not have a material adverse effect on Premiere's business, financial conditions and results of operations." *Id.* at 21. Mr. Chefitz also testified that the risks that Premiere's customers might face financial difficulty were disclosed prior to the merger. *See* Chefitz Depo., at 183-86. With respect to other aspects of

19

the calling card business, Mr. Chefitz testified that during the due diligence process he spoke with executives in the telecommunications industry who discussed with him the pricing pressures in the calling card industry. *See id.* at 163-65 (executives "expressed concern that it was a competitive market and getting increasingly competitive"). Despite an awareness of these risks, Mr. Chefitz testified that he could not recall directing anyone on the due diligence team to contact Premiere's customers. *See id.* at 156-57. Although his due diligence team had access to Premiere's accounts receivable for the calling card business, he did not review them or direct others to do so. *Id.* at 162-63. Further, he did not seek through negotiation to have any specific warranties related to the calling card business in the agreements signed with Premiere. *Id.* at 157.

Roy Andersen, Xpedite's former Chief Executive Officer, informed Mr. Chefitz of the importance of DigiTEC to Premiere's revenues and of his concerns about DigiTEC's financial viability. *See id.* at 151-52 (testifying that Andersen told him that DigiTEC was an "important part" of Premiere's revenues and discussed with him whether "DigiTEC was financially healthy enough to make good on the relationship it had with Premiere"). In describing the due diligence efforts made with respect to DigiTEC, however, Mr. Chefitz testified that DigiTEC "was a public company and we had some of its public materials, public information. I don't remember doing anything more than that. Whether [Roy Andersen] did or not, I don't know." *Id.* at 152. Mr. Chefitz testified that he could not recall instructing anyone to make

20

"direct contact with DigiTEC and [conduct] due diligence of their financial stability and ability to perform under the contract." *Id.* at 155.

As the plaintiffs in *Lazard Freres*, *Grumman*, and *Con Edison*, the court finds that Plaintiffs here had notice of potential problems for Premiere through the description of integration activities, Orchestrate development, and customer viability, in the September 26, 1997 Form S-3 statements. Furthermore, Xpedite's own employee, Roy Andersen, *informed Mr. Chefitz that there were potential problems with the financial viability of DigiTEC*, one of Premiere's major customers. Plaintiffs also had access to corporate records necessary to confirm or disprove the substance of the verbal assurances made to them during the due diligence process. Despite this, Plaintiffs have not proffered any evidence to dispute Defendants' contention that Plaintiffs' due diligence efforts were unsatisfactory. Plaintiffs complain that the deposition testimony cited to by Defendants does not tell the complete story because Mr. Chefitz only supervised the due diligence efforts and Defendants did not take the depositions of every member of the due diligence team from Merrill Lynch, Paul Hastings, and Ernst & Young. Plaintiffs, however, fail to offer any evidence to rebut Defendants' proffered testimony concerning the level of due diligence efforts made by Plaintiffs. Plaintiffs, for example, do not point the court to any testimony by anyone on the due diligence team that shows Plaintiffs attempted to investigate the integration of Voice-Tel and VoiceCom, the technology of Orchestrate, *the financial viability of Premiere's calling card*

21

customers, or DigiTEC. Plaintiffs point only to the fact that Mr. Chefitz directed the Chief

Technical Officer of Xpedite, Dennis Schmaltz, to evaluate Premiere's software platform for

the calling card business, *see* Chefitz Depo., at 108. This mere direction, however, is

*irrelevant to an analysis of whether Plaintiffs engaged in due diligence sufficient to establish*

reasonable reliance. Significantly, Plaintiffs also do not contend that Premiere refused them

access to information during the due diligence process that could have uncovered the financial

realities. *See id.* at 197-201 (no one from Paul Hastings, Xpedite management, Ernst &

Young, or Merrill Lynch informed Chefitz that due diligence information was withheld).[6]

In a conclusory manner, Plaintiffs do contend in their response to Defendants' motion

for summary judgment that even if they had engaged in extensive due diligence, they would

not have been able to uncover the misrepresentations made by Defendants. *See In re CINAR*

*Corp. Sec. Litig.*, 186 F. Supp. 2d 279 (E.D.N.Y. 2002) (suggesting that futility of due

diligence efforts could impact court's analysis because a plaintiff might have no means of

---

[6]In their Statement of Material Facts, Plaintiffs contend that their due diligence team did not have "access" to information concerning Premiere's relationship with DigiTEC, TCCF, Orchestrate, and the Voice-Tel/VoiceCom integration. *See* Plaintiffs' Response to Defendants' Statement of Material Undisputed Facts, ¶ 6. The portions of the record they cite for this proposition, however, have nothing to do with "access" and are, themselves, unsupported allegations that Premiere did not "disclose" this information. *See* Plaintiffs' Statement of Material Facts, ¶¶ 114, 162, 192, 216, and 236. The relevant legal analysis surrounds whether Plaintiffs engaged in sufficient investigation such that they could reasonably rely on Defendants' statements, not whether Defendants "disclosed" this information.

AO 72A
(Rev.8/82)

discovering "the real quality of the subject of the representation"); *DIMON, Inc. v. Folium, Inc.*, 48 F. Supp. 2d 359, 369-69 (S.D.N.Y. 1999) (denying motion to dismiss because plaintiff alleged that accurate financial information was hidden by means of elaborate scheme whereby balances in accounts were shown by fraudulently generated accounts receivable which were "paid" near the time of the closing of the sale). However, Plaintiffs do not provide any support for this bald contention. Nonetheless, the court considers Plaintiffs' specific allegations of misrepresentations to determine whether they are of the nature that would render even sufficient due diligence efforts futile.

Plaintiffs contend that Defendants made material misrepresentations about Premiere's financial condition knowing that Premiere's calling card platform (1) was not fully functional and customers consistently asked for credits from Premiere, (2) could not handle the calls required to maintain Premiere's forecasted revenues, and (3) caused Premiere to pull employees from the Orchestrate project to repair the calling card platform. Plaintiffs also aver that Defendants were aware Premiere required cash deposits from the Telephone Company of Central Florida ("TCCF"), one of its customers, because Premiere was worried about TCCF's financial viability. Plaintiffs next point to the fact that Premiere projected $8 million in revenues for Orchestrate when Premiere did not have a plan or funds in place to develop Orchestrate. Similarly, Premiere projected revenue from its voice messaging system to grow 12% in 1998 when Premiere allegedly knew integration of Voice-Tel/VoiceCom sales force

23

was going to take two years, Voice-Tel sales personnel were leaving and Premiere's internal documents showed future voice messaging revenue would be flat or declining.

The court finds that facts such as these are not uniquely within the possession of Premiere, particularly when Plaintiffs admit that Premiere turned over public and confidential financial information during the due diligence process, Defendants did not restrict the access of Plaintiffs to such information, and many of Plaintiffs' complaints concern the financial viability of Premiere's customers, a matter certainly not exclusively within the province of Premiere's knowledge. There is no scheme or artifice here, like the court described in *CINAR*, that would have prevented Plaintiffs from discovering these issues through their own investigation.[7]

---

[7]Plaintiffs set forth two allegations that at first blush might appear to be more difficult to learn through investigation. First, Plaintiffs contend that Premiere inserted "take or pay provision" into its agreement with DigiTEC in order to bolster revenues after DigiTEC had signed the agreement and without DigiTEC's knowledge. *See* Plaintiffs' Response, at 34 (citing Plaintiffs' Statement of Facts, ¶¶ 105, 107-09). Plaintiffs do not explain why this added provision, contained in the "Revised September 26 Agreement," could not have been discovered through the due diligence process had Plaintiffs made inquiries about Premiere's agreement with DigiTEC. Next, Plaintiffs contend that Premiere "disguised Touch 1's bad debt through sham purchase transaction." *See id.* (citing Plaintiffs' Statement of Facts, ¶¶ 184-89). Plaintiffs' Statement of Facts, however, does not support Plaintiffs' characterization of the transaction, but rather states that Premiere entered into a "Strategic Alliance Agreement" with Touch 1 whereby Premiere purchased Touch 1's calling card customer list and granted Touch 1 certain management rights. Plaintiffs do not explain how this transaction is a "sham" or assert that this agreement, signed in the fall of 1997 would not have been available to them had they inquired during the due diligence process.

24

In sum, the court finds that under New York law, Plaintiffs cannot establish reasonable reliance on Defendants' alleged misrepresentations because Plaintiffs had notice of risk factors related to the areas in which they contend Defendants provided inaccurate information; Plaintiffs are sophisticated parties and were represented by sophisticated legal and financial advisors; and Plaintiffs had access to information through the due diligence process, but did not seek information related to the areas of concern and did not negotiate specific warranties or representations from Premiere concerning these issues. Accordingly, the court GRANTS Defendants' motion for summary judgment with respect to Plaintiffs' negligent misrepresentation claim.[8]

## B.    Standing under the 1933 Securities Act

Section 11 of the Securities Act provides a cause of action against the signers of a registration statement that "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k. Section 12(a)(2) provides a cause of action against any person

---

[8]Although Plaintiffs contend that a due diligence defense to the element of justifiable reliance is a question for the jury, numerous courts applying New York law have granted defendants' motions for summary judgment in negligent misrepresentation claims based on a determination that the plaintiff could not have reasonably relied on the defendants' statements. *See, e.g., Lazard Freres & Co. v. Protective Life Insurance*, 108 F.3d 1531 (2d Cir. 1997); *Grumman Allied Industries, Inc. v. Rohr Industries, Inc.*, 748 F.2d 729, 740 (2d Cir. 1984); *Consolidated Edison Inc. v. Northeast Utilities*, 249 F. Supp. 2d 387, 408-09 (S.D.N.Y. 2003); *Wells Fargo Bank v. Taca International Airlines, S.A.*, 247 F. Supp. 2d 352, 369 (S.D.N.Y. 2002).

AO 72A
(Rev.8/82)

who "offers or sells a security" by means of a prospectus or oral communication "which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77l(a)(2). Sections 11 and 12(a)(2) apply only to public offerings. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 578 (1995).[9] Defendants contend that it is clear Plaintiffs did not acquire their stock through a public offering, and thus, do not have standing under Sections 11 or 12, because (1) Plaintiffs signed separate Stockholder Agreements and Affiliate Letters which governed their receipt of shares in the Premiere/Xpedite merger and restricted the sale of their shares; (2) Plaintiffs had due diligence rights and gained inside, confidential information as a result of those rights; (3) Plaintiffs received other benefits from the sale of certain European subsidiaries; and (4) Plaintiffs had unique positions as early investors in Xpedite.[10]

---

[9]Although some courts have held that aftermarket purchasers cannot bring a claim under section 11, that issue is not relevant to the instant suit. *See generally DeMaria v. Anderson*, 318 F.3d 170 (2d Cir. 2003).

[10]In its prior order, the court noted that Defendants had argued that Plaintiffs had not acquired their stock in a public offering because they were given non-public information relating to Premiere's valuation, the Voice-Tel and VoiceCom acquisitions, as well as other information. Because Plaintiffs had not alleged in their complaint that the information they received about these transactions was non-public, the court declined to address Defendants' argument at the motion to dismiss stage. *See* Order, at 18 n.4. Defendants have renewed this argument after discovery.

26

The court is faced with the unique situation where an offering was made pursuant to a Registration Statement and a Prospectus, but Defendants contend now that the offering to these Plaintiffs was not a public offering.[11]  The parties have not pointed the court to any directly applicable case law and the court has found none.  However, in *Flake v. Hoskins*, 55 F. Supp. 2d 1196 (D. Kan. 1999), the court noted in passing that the mere fact that the defendants had filed a registration statement did not establish that registration was required, and thus, that the offering was a public offering.  *Id.* at 1229 n.21.  *But cf. Gustafson*, 513 U.S. at 569 ("By and large, only public offerings by an issuer of a security, or by controlling shareholders of an issuer, require the preparation and filing of registration statements").  Assuming, then, that the filing of a registration statement is not dispositive on whether the

---

[11]In its previous order on Defendants' motion to dismiss, the court rejected Defendants' argument that because Plaintiffs had signed the Stockholder Agreements prior to the issuance of the Registration Statement and Prospectus, they were already "committed" to vote for the merger, and the Registration Statement and Prospectus could not have influenced their decisions.  The court found that the Merger Agreement here "provided that the obligations of each party to effect the merger were subject to the prior satisfaction of certain conditions" and "could be terminated at any time prior to the effective date 'notwithstanding approval thereof by the stockholders of the Company or the stockholders of Parent,' if there was a material breach of any representation, warranty, covenant, or agreement by either party."  Order, at 17.  Thus, the court found that Plaintiffs had not irrevocably committed themselves to the acquisition of Premiere stock by executing the Stockholder Agreements.

In their motion for summary judgment, Defendants ask the court to reconsider its ruling with respect to the "commitment theory," however, the court finds that no new information has arisen in the course of discovery that would warrant such a reconsideration.  Thus, as the court stated in its February 28, 2000 order, the date of the sale was the effective date of the merger, which occurred after the issuance of the Registration Statement and Prospectus and Plaintiffs acquired their stock pursuant to a Registration Statement.

27

issuance of securities was in the course of a public offering, the court finds that the factors

set forth in *S.E.C. v. Ralston Purina Co.*, 346 U.S. 119 (1953), for determining whether an

offering is an exempt private offering under Section 4(2) of the Securities Act, codified at 15

U.S.C. § 77d(2), to be instructive.

The central question in determining whether an offering should be registered is "the

need of the offerees for the protections afforded by registration." *Ralston Purina Co.*, 346

U.S. at 127. Factors useful in determining whether an offering is exempt from the Securities

Act's registration requirement include: (1) the number of offerees and their relationship to

the issuer; (2) the number of units offered; (3) the size of the offering; and (4) the manner of

the offering. The burden of proving that the offering did not need to be registered falls on the

issuer. *Id.* at 126.

In *Doran v. Petroleum Management Corp.*, 545 F.2d 893 (5th Cir. 1977), the court set

forth these factors and instructed that:

> [c]onsideration of these factors need not exhaust the inquiry, nor is one factor's
> weighing heavily in favor of the private status of the offering sufficient to
> ensure the availability of the exemption. Rather, these factors serve as
> guideposts to the court in attempting to determine whether subjecting the
> offering to registration requirements would further the purposes of the 1933
> Act.

*Id.* at 900. The purpose of the 1933 Act is "to protect investors by promoting full disclosure

of information thought necessary to informed investment decisions." *Id.* The "exemption

question turns on the knowledge of the offerees." *Id.*

28

Plaintiffs, here, are four large pension investment funds and two professional individuals, one of whom sat on the Board of Directors of Xpedite. The APA Funds "were generally limited partnerships, sophisticated large institutional investors . . . ." Chefitz Depo., at 24. The investors in APA Excelsior III, L.P. "were large pension funds who had alternative/private equity classes that participated in venture funds." *Id.* at 65. Some of the investors were the AT&T pension fund managed by J.P. Morgan, the State of New York, and Nynex's pension fund. *Id.* The minimum investment amount was $5 million. *Id.* APA Excelsior III Offshore L.P. was comprised of "sophisticated corporate pension funds . . . from foreign companies." *Id.* at 70. APA/Fostin Pennsylvania Venture Capital Fund had Pennsylvania's "two largest state pension funds, . . . the state employees' pension fund and the state teachers' fund." *Id.* at 71. David Epstein is in the real estate business developing shopping malls. Stuart Epstein is an attorney. Furthermore, as described above, Plaintiffs had the guidance of Merrill Lynch, Paul Hastings, and Ernst & Young during the due diligence process. Merrill Lynch, itself, was represented by Simpson, Thatcher & Bartlett.

The manner of the offering to these Plaintiffs took place through the signing of a Stockholder Agreement, an Affiliate Letter, and a due diligence period, all which occurred two months before the Registration Statement was issued. The negotiations between Premiere and certain officers of Xpedite which led to the Stockholder Agreement and Affiliate Letter were available to a very small number of people. Only eight of Xpedite's shareholders signed

AO 72A
(Rev.8/82)

the Affiliate Letter, including Robert Chefitz for APA Excelsior III, L.P., APA/Fostin

Pennsylvania Venture Capital Fund, L.P., APA Excelsior III/Offshore, L.P., and CIN Venture

Nominees, Ltd.; Robert Chefitz individually; Philip A. Campbell, Roy B. Andersen, Vincent

DeVita, and Max A. Slifer, officers with Xpedite; John C. Baker, a senior vice president and

partner in APA; and David Epstein. As described above, Plaintiffs agree that during the due

diligence process, Premiere gave public and confidential financial information to Xpedite's

due diligence investigators, including historical and forecasted financial information, such as

the latest available aging of accounts receivable, containing collections since aging date, and

aging of accounts payable. Thus, in addition to being sophisticated investors, Plaintiffs had

access to relevant information. *See Doran*, 545 F.2d at 902. Significantly, other Xpedite

shareholders did not acquire their Premiere securities with the benefits of the Stockholder

Agreement, Affiliate Letter, and the due diligence process. As such, the court finds that

Plaintiffs had a unique relationship with Premiere as a result of their status within the Xpedite

organization and acquired their securities in a manner different from all other Xpedite

shareholders.

Furthermore, by signing the Affiliate Letter, Plaintiffs expressly acknowledged that

they were aware that Premiere had no obligation to file a Registration Statement for the

offering to them. *See* Affiliate Letter, Defs.' Mot. S.J., Exh. B, § 3(b) (the "undersigned

understands that, except as provided in the Agreement, Parent is under no obligation to file

a registration statement with the SEC covering the disposition of the undersigned's shares of Parent Common Stock or to take any other action necessary to make compliance with an exemption from such registration available"). By signing the Affiliate Letter, Plaintiffs also recognized that their Premiere stock was subject to restrictions on resale within thirty days after the merger was finalized. *See id.*, § 4.

Here, the court concludes that it would not serve the purposes of the 1933 Act to allow sophisticated investors who had access to significant confidential and inside information through the exercise of due diligence rights to convert their acquisition of securities into a public offering by mere fact that Defendants provided a Registration Statement. In *Doran*, the court described the purpose of the 1933 Act as promoting full disclosure of information necessary for informed investment decisions. 545 F.2d at 900. Plaintiffs, here, had knowledge of certain risks and full access to information. Thus, Plaintiffs are not of the type of investor requiring the protections of the Securities Act when receiving securities in a manner different than other investors. *See also Maldonado v. Dominguez*, 137 F.3d 1, 8 (1st Cir. 1998) (a "placement of stock is private if it is offered only to a few sophisticated purchasers who each have a relationship with the issuer, enabling them to command access to information that would otherwise be contained in a registration statement"). Unlike the investors who did not negotiate a Stockholder Agreement, Affiliate Letter, or conduct due diligence, these Plaintiffs had available to them confidential, inside information from

31

Premiere. Said another way they did not obtain their stock pursuant to the registration statement. Accordingly, the court GRANTS Defendants' motion for summary judgment on Plaintiff's securities claims.[12]

## III.    Conclusion

The court GRANTS Defendants' motion for summary judgment [150-1]. The court DENIES AS MOOT Defendants' motion in limine [149-1]. The Clerk of the Court is DIRECTED to DISMISS WITH PREJUDICE Plaintiffs' complaint.

**IT IS SO ORDERED** this _____ day of September 2003.

J. OWEN FORRESTER
UNITED STATES DISTRICT JUDGE

ENTERED ON DOCKET

SEP 3 0 2003

DEPUTY CLERK

---

[12]Because the court grants Defendants' motion for summary judgment, the court DENIES AS MOOT Defendants' motion in limine to exclude the testimony of Plaintiffs' expert Scott Hakala.

32